UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------------- X

GERALD DAVIS

Plaintiff,

-against-

NEW YORK STATE OFFICE OF MENTAL HEALTH,
BROOKLYN CHILDREN'S CENTER, ILLOUISE
MURILLO, and DIANE AMAN

Defendants.

X

::
::
:
:
:
:
:
:
:
:
:
:

05-CV-5599(ARR)(LB)

NOT FOR PRINT OR
ELECTRONIC
PUBLICATION

OPINION AND ORDER

-------------------------------------------------------------------

ROSS, United States District Judge:

Plaintiff, Gerald Davis, proceeding pro se, brings this suit against his former employers,

the New York State Office of Mental Health ("OMH"), and its component organization the

Brooklyn Children's Center ("BCC"), for discrimination on the basis of his disability and

retaliation, in violation of the Rehabilitation Act ("RA"), 29 U.S.C. § 701 et seq., § 791 et seq.

Plaintiff, formerly a mental health therapy aid at BCC, alleges that his employer unlawfully failed

to accommodate his disability and terminated his employment. In addition, plaintiff brings

disability discrimination claims against two employees of BCC, Illouise Murillo, Director of

Nursing, and Diane Aman, the Quality Assurance Director of BCC's Psychiatric Center who was

subsequently appointed as the Acting Executive Director during plaintiff's employment, pursuant

to the Rehabilitation Act, 42 U.S.C. § 1983 for alleged violations of plaintiff's Fourth

Amendment rights to due process and equal protection, New York State Human Rights Law

1

("NYSHRL"), N.Y. Exec. § 290, et seq., and New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code § 8-107.[1]

The defendants have moved for summary judgment pursuant to Fed. R. Civ. P. 56 on the grounds that plaintiff failed to make out <u>prima facie</u> cases of disability discrimination under the Rehabilitation Act, NYSHRL, and NYCHRL and plaintiff was terminated for legitimate non-discriminatory reasons – his poor time and attendance records. Defendants further argue that some of plaintiff's claims are barred by the applicable statute of limitations and plaintiff's section 1983 claims fail because he was afforded the due process required and has produced no evidence to support his equal protection claim. Plaintiff has failed to respond in opposition, despite an order directing him to respond and notifying him that if he failed to file a response, the court would decide the motions without the aid of his arguments and evidence. <u>See</u> Dkt. No. 62. For the reasons that follow, the motion is granted and the action is dismissed.

I.    Facts

The evidence in the record, viewed favorably to the plaintiff, would permit a jury to find the following.

Plaintiff was employed as a mental health therapy aid at BCC, from February 1997 to November 2002. BCC is a mental health treatment facility operated by OMH, a New York State agency which operates numerous psychiatric centers throughout the state. BCC provides

---

[1] Plaintiff initially also brought claims against defendants New York State Office of Mental Health and Brooklyn Children's Center alleging violations of section 1983, NYSHRL, and NYCHRL. Plaintiff voluntarily withdrew these claims by stipulation approved and ordered by Judge Nina Gershon on June 12, 2007. (Dkt. No. 30.) The stipulation and order also terminated all claims against defendant James L. Stone, Commissioner of New York State Office of Mental Health, who is therefore no longer a party to this suit. (<u>Id.</u>)

inpatient, day, and short-term residential treatment programs for emotionally disturbed children and adolescents in Brooklyn, New York.

On November 18, 2002, plaintiff's employment was terminated by BCC. The termination was precipitated by plaintiff's violating the conditions of his term of probationary employment, following his long history of discipline for lateness and unscheduled absences. (See Aman Decl. ¶¶ 29, 31; Murillo Decl. ¶ 5.)

BCC's Employee Handbook – which plaintiff received during his new employee orientation – outlines its attendance policy requiring employees to call the office if they cannot come to work and warns that failure to call in and repeated unscheduled absences may lead to disciplinary action. (See Davis Dep. at 54.) Plaintiff's attendance problems began in 1998, one year after he was hired. On January 18, 1999, plaintiff was counseled about his repeated lateness to work, which began on July 2, 1998. In a memorandum of supervisory conference documenting the January 18, 1999 meeting, signed by both plaintiff and his supervisor, plaintiff affirmed that he was told to improve his lateness and he responded that he would try to modify his schedule to arrive at work earlier. (Aman Decl. Ex. C.) On July 2, 1999, plaintiff received a memorandum from BCC's Inpatient Administrator documenting that she met with plaintiff both on June 25 and July 2 to discuss his continuing to arrive late to work. (Aman Decl. Ex. D.) The memorandum indicated that plaintiff's work shift would be changed at his request to begin at 8:30 a.m. instead of 7:30 a.m. to help him arrive to work on time.[2] (Aman Decl. Ex. D.) Plaintiff was advised in a July 28, 2000 memorandum, which plaintiff signed upon receipt, that

---

[2] Plaintiff acknowledged in his deposition that his work schedule was not changed because of a medical reason. (Davis Dep. at 124.)

BCC would no longer honor alternate scheduling assignments and beginning August 31, 2000, plaintiff must again report to work at 7:30 a.m. (Aman Decl. Ex. E.)

On September 12, 2000, plaintiff was served with two notices of discipline, one regarding his absences and the other regarding his lateness. (Aman Decl. Ex. F.) According to the first notice, plaintiff had 32 unscheduled full-day absences in the year-long period between August 29, 1999 and August 29, 2000. (Aman Decl. Ex. F.) According to the second notice, plaintiff was late to work on 35 days in the same year-long period. (Aman Decl. Ex. F.) Plaintiff, his union representative, and his employer reached a settlement on both notices of discipline and plaintiff agreed to pay fines of $150 for each notice. (Aman Decl. Ex. F.)

On September 25, 2000, plaintiff was sent a letter regarding five unauthorized absences since September 20, 2000. (Aman Decl. Ex. G.) The letter warned plaintiff that "[t]his absence will be considered to constitute resignation pursuant to Article 36 of the CSEA [union] contract unless you return to work or personally contact the personnel office by October 5, 2000, close of business." (Aman Decl. Ex. G.)

On August 15, 2001, plaintiff was served with a notice of discipline for eight absences between February 27, 2001 and June 30, 2001 and failure to call his employer to advise that he would be absent. (Aman Decl. Ex. H.) Plaintiff reached a settlement and agreed to pay a $75 fine for the violation. (Aman Decl. Ex. H.)

On August 31, 2001, plaintiff was served with a notice of discipline for three absences in a two-week period and failure to call his employer to advise of the absences. (Aman Decl. Ex. I.) The notice of discipline was settled with a two-week suspension. (Aman Decl. Ex. I.)

On November 28, 2001, plaintiff received a notice of discipline, dated two days earlier, for 16 unscheduled absences between September 8, 2001 and November 13, 2001. (Aman Decl. Ex. J.) The notice of discipline advised plaintiff that the recommended penalty to be assessed was dismissal. (Aman Decl. Ex. J.) Prior to reaching a settlement on the notice of discipline, on May 10, 2002, plaintiff was served with a notice of discipline for ten unscheduled absences between December 1, 2001 and January 26, 2002. (Aman Decl. Ex. L.) The recommended penalty to be assessed was dismissal. (Aman Decl. Ex. L.) A settlement was reached for the November 2001 and May 2002 notices, whereby plaintiff was suspended for six months and upon his return to work on September 16, 2002 he was to be placed on a one-year probationary period. (Aman Decl. Ex. M.) Pursuant to the settlement agreement signed by plaintiff, if plaintiff violated any of the following conditions during his probationary period he would be terminated: (1) employee shall have no unauthorized absence ("no call/no show") during the probation period; (2) employee shall have no more than one unscheduled absence in a 28 day period; (3) employee shall have no more than six unscheduled absences during the probation period; (4) employee shall have no more than two lateness of 15 minutes or less in a 28 day period; (5) employee shall have no more than one instance of lateness in excess of 15 minutes in a 28 day period; and (6) employee shall have no more than two instances of lateness of any duration in a 28 day period. (Aman Decl. Ex. M.)

When plaintiff returned to work on September 16, 2002, he expressed his unhappiness with his work shift. However, by signed letter dated October 10, 2002, plaintiff advised his employer: "I[,] Gerald Davis[,] withdraw my grievance of working on the evening shift and would like to remain on the shift for personal reasons." (Aman Decl. Ex. N.) Plaintiff testified

5

that when he returned to work in 2002 his request was to stay in his assigned shift. (Davis Dep. at 82.)[3] Plaintiff was terminated on November 18, 2002, after his unscheduled absence on September 21, late arrival on October 13, and two late arrivals and two absences without calling in between October 31 and November 13. (Aman Decl. ¶ 25.) According to Aman, the decision to terminate plaintiff was made by BCC's human resources department with input from Director of Nursing Murillo, after plaintiff failed to abide by the conditions of his probation. (Aman Decl. ¶ 29.) Both Aman and Murillo stated in their sworn declarations that plaintiff was terminated for legitimate, non-discriminatory reasons based on his poor time and attendance record. (See Aman Decl. ¶ 31; Murillo Dec. ¶ 5.) Plaintiff admitted in his deposition that there were times when he had unscheduled absences from work. (Davis Dep. at 214.)

Plaintiff claims that his termination was motivated by disability discrimination and occurred following the denial of his request for a reasonable accommodation. (Compl. ¶¶ 32, 34, 36.) Plaintiff also alleges retaliation for his complaints of disparate treatment. (Compl. ¶ 37.) Plaintiff failed to file a response to defendants' motion for summary judgment, and therefore he did not provide the court with any of his own evidence on which to rely.

Regarding his disability discrimination claims, plaintiff alleged in his complaint that during his employment at BCC he was disabled by chronic active Hepatitis secondary to Hepatitis C. (Compl. ¶ 10.) The record establishes that plaintiff was first diagnosed with chronic Hepatitis in November 2000. (Davis Dep. at 124.) In November 2000, after plaintiff was diagnosed, BCC administrators received a letter from plaintiff's treating physician, Dr. Stephen

---

[3] Plaintiff's deposition testimony indicates that in September 2002 he requested a reasonable accommodation of a shift change, but soon after, he retracted the request and asked to be kept on his assigned shift. (Davis Dep. at 165.)

P. Esposito, stating that plaintiff suffered from chronic active Hepatitis secondary to Hepatitis C, which is "complicated by severe fatigue, abdominal pain and nausea." (Marcellin Decl. Ex. O.) Dr. Esposito requested that plaintiff be allowed to take a three-month medical leave because plaintiff would be starting interferon treatment, which "may exacerbate his fatigue therefore, he may be unable to work." (Marcellin Decl. Ex. O.) Plaintiff subsequently applied for and was granted a three-month leave – from November 2000 to February 2001 – under the Family and Medical Leave Act ("FMLA").

In February 2001, upon plaintiff's return to work, BCC administrators received a follow-up letter from Dr. Esposito, explaining that plaintiff began Rebetron therapy in December 2000, which was causing him "severe fatigue, irritability, insomnia and shortness of breath." Dr. Esposito advised BCC that "[d]ue to these side effects, [plaintiff's] work duties should be adjusted so that he may continue to work as well as receive his treatment." (Marcellin Decl. Ex. P.) Following the receipt of Dr. Esposito's letter, Reva Marcellin, BCC's Diversity Planning/Affirmative Action Administrator, met with plaintiff to discuss a reasonable accommodation. A decision about a reasonable accommodation was delayed pending receipt of plaintiff's required medical documentation paperwork.

On March 27, 2001, plaintiff submitted the requested medical documentation necessary to be considered for a reasonable accommodation. On plaintiff's "estimated physical capabilities form," Dr. Esposito indicated that plaintiff can stand, sit, and walk, in combination, for eight hours a day. (Marcellin Decl. Ex. Q.) Dr. Esposito also indicated that plaintiff could assist in the restraining of combative patients and could frequently lift weights of up to 50 pounds and occasionally lift weights of up to 100 pounds. (Marcellin Decl. Ex. Q.) Dr. Esposito wrote that

plaintiff would be ready to return to full duty in June 2001. On June 6, 2001, plaintiff was granted a reasonable accommodation of a change to his shift start time, to begin work at 8:30 a.m. instead of 7:30 a.m, finishing his shift at 5:00 p.m. Plaintiff was advised in the notice approving his requested accommodation to provide follow-up medical documentation by July 31, 2001. (Marcellin Decl. Ex. Q.)

In a letter dated November 29, 2001, plaintiff was advised that he was being returned to full duty without the benefit of his previously approved reasonable accommodation. (Marcellin Decl. Ex. R.) The letter explained: "In assessing medication documentation provided by your doctor dated February 13, 2001 and March 27, 2001 respectively, Brooklyn Children's Center has met the terms and conditions of Dr. Stephen P. Esposito request, namely, to accommodate your medical condition and functional limitations via a shift adjustment until June 2001." (Marcellin Decl. Ex. R.) Marcellin informed plaintiff in person that BCC had satisfied his reasonable accommodation request and that plaintiff was being returned to full duty unless he submitted further medical documentation. (Marcellin Decl. ¶ 20.) Plaintiff made no further requests for a reasonable accommodation. (Marcellin Decl. ¶ 21.)

Defendants submitted for the court's review Dr. Esposito's handwritten medical records, in which he wrote in December 2000 that plaintiff was "diagnosed with mild Hepatitis" and wrote in June 2004 that "patient returns today after not being seen for 3 years," indicating that plaintiff did not seek treatment for his Hepatitis C from 2001 to 2004. (See Skolnick Decl. Ex. T.)

Plaintiff testified that his Hepatitis C prevented him from performing his duty of "[r]estraining which is the main one and standing five to six hours and I would need short breaks

8

after I restrained somebody which I was not allowed to take." (Davis Dep. at 126.) Plaintiff testified that he experiences fatigue and insomnia. (Davis Dep. at 54, 133.)

Plaintiff also testified that in the year 2000, he drank about a pint of rum daily and by 2001, he drank a quart of rum daily – a pint on his way home from work and another pint when he arrived home. (Davis Dep. at 77.) He testified that when he returned to work in September 2002, on his probationary employment, he began drinking again." (Davis Dep. at 78.) He described that drinking "exacerbated the medication and the underlying condition, the symptoms of, you know Hepatitis C, the strain I had. So I thought I was going to drink to put myself to sleep and energize, you know, like make me not feel tired but I believe it started working against me." (Davis Dep. at 75.) When asked how drinking helped his Hepatitis C, he testified that "[i]t hurt it." (Davis Dep. at 78.) Plaintiff also testified that "I was always drinking, I was always an alcoholic." (Davis Dep. at 232.) He further testified that some of his unscheduled absences were due to his drinking, because his Hepatitis was at its worst and he self-medicated with alcohol. (Davis Dep. at 253.) He also testified that he has abused all drugs, including marijuana, LSD and mushrooms, and when he was asked when he stopped using illegal drugs his answer was "[b]asically never. I smoke some refer now and then and I always drink." (Davis Dep. at 232.) He also admitted that restraining orders have been issued against him because of his drinking. (Davis Dep. At 234.) Plaintiff did not allege in his complaint that he was disabled because he is an alcoholic.

Regarding his claim of retaliation, plaintiff testified during his deposition that Murillo did not retaliate against him and that he was not in fact retaliated against. (Davis Dep. at 70.) Although plaintiff testified at one point that he complained to the "employment assistance

9

program," he clarified that he made no internal complaints except maybe to his union, but he doesn't recall whether or not he actually made a complaint to the union and what he alleged. (See Davis Dep. at 180-82.) Plaintiff also testified that he tried to file an administrative complaint with the New York State Division of Human Rights alleging that BCC discriminated against him on the basis of his disability, but he was told it was too late for him to file the complaint. (Davis Dep. at 10.)

The record contains evidence that in addition to his unscheduled lateness and absences, plaintiff was disciplined for sexually harassing a co-worker by touching her in an inappropriate manner while in the building's lobby in January 2002. (Aman Decl. Ex. K.) Plaintiff testified that the co-worker was his friend. (Davis Dep. at 79.) Plaintiff was first suspended from duty effective March 4, 2002 because it had been determined that he was a "potential danger to persons or property, or that your continued presence would severely interfere with facility operations." (Aman Decl. Ex. K.) On March 21, 2002, plaintiff was served with a notice of discipline for sexual harassment, which recommended that he be terminated. (Aman Decl. Ex. K.) Plaintiff was instead suspended until legal proceedings concluded. (Davis Dep. at 197; Aman Decl. ¶ 21; Aman Decl. Ex. K.) According to plaintiff, he could not return to work until the sexual harassment case was dismissed. (Davis Dep. at 197.)

II.    Discussion

    A.    Summary Judgment Standard

Under Federal Rule of Civil Procedure 56(c), a moving party is entitled to summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to

judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Gallo v. Prudential Residential Servs., 22 F.3d 1219, 1223 (2d Cir. 1994). The function of the court is not to resolve disputed issues, but to determine whether there is a genuine issue to be tried. See Anderson v. Liberty Lobby Inc., 477 U.S. 242, 249 (1986). In addressing a motion for summary judgment, "the court is required to draw all factual inferences in favor of the party against whom summary judgment is sought." Balderman v. U.S. Veterans Admin., 870 F.2d 57, 60 (2d Cir. 1989). Summary judgment should be granted "[o]nly when no reasonable trier of fact could find in favor of the nonmoving party." Cruden v. Bank of N.Y., 957 F.2d 961, 975 (2d Cir. 1992).

The moving party bears the initial burden of demonstrating that no genuine factual dispute exists. See Cronin v. Aetna Life Ins. Co., 46 F.3d 196, 202 (2d Cir. 1995). If the movant successfully shoulders its initial burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." Anderson, 477 U.S. at 250. The non-moving party must "do more than simply show there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). "[T]he mere existence of some alleged dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson, 477 U.S. at 247-48. Only when it is apparent that no rational finder of fact "could find in favor of the non-moving party because the evidence to support its case is so slight" should summary judgment be granted. Gallo, 22 F.2d at 1223.

In addition to viewing the facts in the light most favorable to the nonmoving party, the court liberally reviews pro se submissions, including plaintiff's submissions, "to raise the strongest arguments that they suggest." Bennett v. Goord, 343 F.3d 133, 137 (2d Cir. 2003)

11

(internal quotation marks omitted). Plaintiff has not filed a response to defendants' motion. "Even when a motion for summary judgment is unopposed, the district court is not relieved of its duty to decide whether the movant is entitled to judgment as a matter of law." Vt. Teddy Bear Co. v. 1-800 Beargram Co., 373 F.3d 241, 242 (2d Cir.2004). The movant has the burden of demonstrating the absence of a genuine issue of material fact, and this burden may not be met exclusively by the movant's Local Rule 56(a) 1 statement; nevertheless, "the failure to respond may allow the district court to accept the movant's factual assertions as true ." Id. at 244, 246.

B.    Time-Barred Claims

Defendants assert that any claims arising from events that occurred before November 17, 2002, three years prior to plaintiff's filing of the complaint on November 17, 2005, are barred by the three year statute of limitations applicable to the Rehabilitation Act and Section 1983 claims. I agree. In New York, the three-year statute of limitations for personal injury actions, N.Y. C.P.L.R. § 214(5), applies to Rehabilitation Act and Section 1983 claims. See Bates v. Long Island R.R. Co., 997 F.2d 1028, 1037 (2d Cir. 1993); Morse v. Univ. of Vt., 973 F.2d 122, 126-27 (2d Cir. 1992). Therefore, because plaintiff was terminated on November 18, 2002, his discriminatory termination claim is timely. However, plaintiff's claims that his reasonable accommodation was unlawfully rescinded in December 2001 and he was unlawfully denied a reasonable accommodation in September 2002 are time-barred. (See Compl. ¶¶ 26-28.)

Under federal law, a claim accrues when the plaintiff "knows or has reason to know of the injury that is the basis of the action." Bates, 997 F.2d at 1037. Thus, "the timeliness of a discrimination claim is measured from the date the claimant receives notice of the allegedly discriminatory decision." O'Malley v. GTE Serv. Corp., 758 F.2d 818, 820 (2d Cir.1985).

According to plaintiff's complaint, he learned that his accommodation was rescinded in December 2001 and he learned that an accommodation request was denied in September 2002. The statute of limitations began to run on those dates when he learned of his employer's decisions and his claims are therefore time-barred.

Even if plaintiff had argued that his claims alleging failure to accommodate were nevertheless actionable under the "continuing violation" theory, the court would have found the claims time-barred. Prior to the Supreme Court's holding in National Railroad Passenger Corp. v. Morgan, 536 U.S. 101 (2002), the continuing violation doctrine permitted recovery for discriminatory conduct that occurred outside of the applicable limitations period if the conduct was part of a "practice or policy" of discrimination. See Fitzgerald v. Henderson, 251 F.3d 345, 359 (2d Cir. 2001). However, Morgan substantially restricted the scope of the continuing violation doctrine by holding that "[e]ach discrete discriminatory act starts a new clock for filing charges alleging that act."[4] Morgan, 536 U.S. at 113. The Supreme Court went on to identify "termination, failure to promote, denial of transfer, or refusal to hire" as examples of conduct that constituted a "discrete discriminatory act." Id. at 113-14. The Second Circuit has held Morgan applicable to cases wherein the plaintiff alleges a refusal to accommodate based upon religious practice. See Elmenayer v. ABF Freight System, Inc., 318 F.3d 130, 134-35 (2d Cir. 2003)("[A]n employer's rejection of an employee's proposed accommodation for religious practices does not give rise to a continuing violation. Rather, the rejection is the sort of 'discrete

---

[4] Even before the Supreme Court's decision in Morgan, the continuing violation doctrine was disfavored by courts in the Second Circuit. See, e.g., Bernstein v. The MONY Group, Inc., 228 F. Supp. 2d 415, 418 (S.D.N.Y. 2002); Salgado v. City of N.Y., 00 Civ. 3667(RWS), 2001 WL 290051, at *5 (S.D.N.Y. Mar. 26, 20001); Curtis v. Airborne Freight Corp., 87 F. Supp. 2d 234, 244 (S.D.N.Y. 2000).

act' that must be the subject of a complaint . . . within [the applicable statute of limitations period]."). This rationale has also been applied in cases alleging a failure to make a reasonable accommodation under the Rehabilitation Act and the ADA. See Baker v. CSX Transp., 546 F. Supp. 2d 90, 96-97 (W.D.N.Y. 2008)(holding that unlawful termination claim was timely but failure to accommodate claim was time barred); Lipka v. Potter, No. 03-CV-381A, 2006 WL 839421, at *4 (W.D.N.Y. Mar. 28, 2006)("A failure to reasonably accommodate an employee occurs the first instance when an employer refuses to make an accommodation to an employee that otherwise qualifies under § 504 [of the Rehabilitation Act] or the ADA."); Stuevecke v. N.Y. Hosp. Med. Ctr. of Queens, No. 01-CV-326(FB)(RLM), 2003 WL 22019073, at *4 (E.D.N.Y. Aug. 26, 2003)(separate instances of failure to accommodate under the ADA are discreet acts and do not constitute a "continuing violation"). It appears that the continuing violation doctrine applies only to cases of alleged hostile work environment or claims which involve a series of acts necessary to comprise the alleged discriminatory action. See Morgan, 536 U.S. at 117; Nakis v. Potter, No. 01-CV-10047(HPB), 2004 WL 2903718, at *10-11 (S.D.N.Y. Dec. 15, 2004). Plaintiff has not demonstrated a basis warranting the application of the continuing violation doctrine to this case and therefore his claims alleging a failure to provide a reasonable accommodation are time-barred.

C.    Rehabilitation Act Claims Against Murillo And Aman

Individuals may not be held liable, in either a personal capacity or an official capacity, under Section 504 of the Rehabilitation Act. See Garcia v. S.U.N.Y. Health Sciences Ctr. of Brooklyn, 280 F.3d 98, 107 (2d Cir.2001); Darcy v. Lippman, 03-CV-6898, 2008 WL 629999, at *4 (S.D.N.Y. Mar. 10, 2008); Hallet v. N.Y. State Dep't of Corr. Servs., 109 F. Supp. 2d 190,

199 (S.D.N.Y. 2000). Plaintiff has asserted Rehabilitation Act claims against defendants Murillo and Aman. Those claims are dismissed.

### D. Rehabilitation Act Disability Discrimination Claims Against OMH And BCC

The Rehabilitation Act provides in relevant part:

> No otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance[.]

29 U.S.C. § 794(a).

Courts in the Second Circuit apply the burden-shifting analysis of Title VII employment discrimination claims set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), and its progeny to claims brought under the Rehabilitation Act. See Reg'l Econ. Cmty. Action Program, Inc. v. City of Middletown, 294 F.3d 35, 48-49 (2d Cir. 2002). Under this analysis, the plaintiff bears the initial burden of establishing a prima facie case under the Rehabilitation Act. See Heilweil v. Mount Sinai Hosp., 32 F.3d 718, 722 (2d Cir. 1994). The burden then shifts to the employer to assert a neutral reason, unrelated to plaintiff's disability for its employment decision. Id. If the employer articulates a legitimate non-discriminatory reason for the employment decision, the burden then shifts back to the plaintiff to show that the employer's stated reason is a pretext for discrimination. Id.

### 1. Plaintiff has Failed to Establish a Prima Facie Case of Disability Discrimination

To establish a prima facie case under the Rehabilitation Act, a plaintiff must show: (1) he is handicapped or disabled under the Act; (2) he is otherwise qualified to perform his job; (3) he suffered an adverse employment action because of his disability; and (4) the employer is a

15

recipient of Federal financial assistance. Heilweil v. Mount Sinai Hosp., 32 F.3d 718, 722 (2d Cir. 1994). Plaintiff has failed to meet this burden because he is not disabled within the meaning of the Rehabilitation Act.

The Rehabilitation Act defines a disabled person as one who "(i) has a physical or mental impairment which substantially limits one or more of [his] major life activities, (ii) has a record of such an impairment, or (iii) is regarded as having such an impairment." 29 U.S.C. § 705(20)(B). Working, walking, standing, sitting, sleeping, and lifting are unquestionably "major life activities," Colwell v. Suffolk County Police Dept., 158 F.3d 635, 642 (2d Cir. 1998) and a "substantial limitation" is a limitation that renders the individual

> significantly restricted as to the condition, manner or duration under which [he] can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.

29 C.F.R. § 1630.2(j)(1)(ii); see also Emanuel v. N.Y., No. 08-CV-1250, 2009 WL 4277075, at *7 (S.D.N.Y. Nov. 25, 2009)(applying the Americans with Disabilities Act regulations to the Rehabilitation Act analysis). Plaintiff alleges in his complaint that his chronic active Hepatitis secondary to Hepatitis C is a physical impairment that substantially limits one or more of his major life activities, but he fails to identify which major life activities are substantially impaired either by his chronic active Hepatitis or the treatment he received for the disease. (See Compl. ¶¶ 10, 44.) During his deposition, plaintiff testified that he has insomnia and that his condition made it difficult for him to stand five to six hours and to restrain BCC's clients when performing his job. (See Davis Dep. at 54, 126, 133.) The court therefore construes plaintiff's claim as alleging that his impairment substantially limited his ability to sleep and work.

No one disputes that plaintiff's chronic active Hepatitis is an impairment under the Rehabilitation Act. Defendants' argue, however, that on this record no reasonable juror could find that plaintiff's condition substantially limited any of his major life activities. The determination of whether or not a person suffers a disability under the Rehabilitation Act "is an individualized inquiry" that does not rest on the mere diagnosis of an impairment. See Sutton v. United Air Lines, 257 U.S. 471, 483 (1999).

The only medical documentation in the record are a series of two signed letters and one signed standard form from plaintiff's physician Stephen Esposito. Dr. Esposito informed BCC by signed letter dated November 2000 that chronic active Hepatitis secondary to Hepatitis C is "complicated by severe fatigue, abdominal pain and nausea" and that plaintiff would be undergoing therapy which could exacerbate his fatigue rendering plaintiff "unable to work". (Marcellin Decl. Ex.O.) In February 2001, after plaintiff returned to work from his three month medical leave, Dr. Esposito informed BCC by signed letter that plaintiff "has experienced severe fatigue, irritability, insomnia and shortness of breath secondary to the medication he is receiving" and asked that plaintiff work duties be adjusted "so that he may continue to work as well as receive his treatment." (Marcellin Decl. Ex. P.) On March 27, 2001, Dr. Esposito completed a standard form in which he answered the question "when, in your estimation, will this employee be ready to return to full duty" with the answer "June 2001". (Marcellin Decl. Ex. P.) On the standard form, Dr. Esposito indicated that plaintiff could sit, stand, and walk, for eight hours a day, with rests, and could frequently lift up to 50 pounds and occasionally lift up to 100 pounds. (Marcellin Decl. Ex. P.) Dr. Esposito also indicated that plaintiff can "assist in the restraint of combative patients." The March 2001 signed form was the last piece of medical documentation

17

that plaintiff provided to BCC. Defendants have also submitted into evidence Dr. Esposito's handwritten notes on plaintiff's medical chart indicating that plaintiff had not reported for medical treatment from 2001 to 2004. (See Skolnick Decl. Ex. T.)

Dr. Esposito's estimations of plaintiff's abilities as of March 2001, indicates that plaintiff had few limitations on his abilities to work and would be ready to return to full duty in June 2001. Plaintiff provided no medical evidence indicating that after June 2001 he could not work or that he was experiencing insomnia or fatigue, which affected his ability to work.

Plaintiff's failure to provide medical documentation of his alleged sleeping difficulties and difficulties working renders his "substantial limitation" showing insufficient as a matter of law. "Courts in the Second Circuit have consistently held that when a plaintiff fails 'to offer any medical evidence substantiating the specific limitations to which he claims he is subject due to his condition,' he cannot establish that he is disabled within the meaning of the [Rehabilitation Act." Baerga v. Hosp. for Special Surgery, No. 97 Civ. 230, 2003 WL 22251294, *6 (S.D.N.Y. Sept. 30, 2003)(quoting Johnson v. St. Clare's Hosp. & Health Ctr, No. 96 Civ. 1425(MBM)(AJP), 1998 WL 236235, *8 (S.D.N.Y. May 13, 1998), aff'd 175 F.3d 1008 (2d Cir. 1999) and compiling cases)[5]; see also Heilwell v. Mount Sinai Hosp., 32 F.3d 718, 723 (2d Cir. 1994)(plaintiff "contends her asthma significantly affected her day-to-day functioning. . . . No medical proof substantiates this assertion. And, to defeat a motion for summary judgment a plaintiff cannot rely on 'conjecture or surmise. . . .'"); Sussle v. Sirina Prot. Sys. Corp., 269 F. Supp. 2d 285, 301-02 (S.D.N.Y. 2003) (plaintiff's failure to offer medical evidence

---

[5] Baerga is an Americans with Disabilities Act case, but the two statutes use identical definitions of "individual with a disability," and ADA case law is applicable to the Rehabilitation Act. See Francis v. City of Meriden, 129 F.3d 281, 285 n.4 (2d Cir. 1997).

substantiating the alleged limitations that Hepatitis C had on his ability to have sexual relationships precluded him from establishing that he suffered a disability within the meaning of the ADA). Thus, plaintiff's own brief, non-detailed, self-serving statements that he experienced insomnia and that it was difficult to restrain patients do not, by themselves, demonstrate an impairment that substantially limits the major life activities of sleep or working.

Moreover, with regard to the major life activity of sleeping, "[i]t has been recognized that difficulty sleeping is a common problem, and the mere allegation that plaintiff had difficulty sleeping is not sufficient to show a substantial limitation in the major life activity of sleeping." Baker v. CSX Transp., Inc., 546 F. Supp. 2d 90, 98 (W.D.N.Y. 2008)(internal quotation marks and citations omitted). In cases where courts have found that plaintiffs made a sufficient showing of substantial limitation of their ability to sleep, the plaintiffs supported their allegations with documented medical evidence. See Felix v. N.Y. City Transit Auth., 154 F. Supp. 2d 640, 654 (S.D.N.Y. 2001) (plaintiff's sleep disturbance was "well documented" by defendant employer's medical assessment center); Knorr v. Pepsico Food Servs., Inc., No. 97-CV-1819 (NPM), 1999 WL 200685, at *9 (N.D.N.Y. Apr. 8, 1999) (plaintiff's insomnia was "well documented" by her physician and therapist).

Accordingly, because the court finds that plaintiff's impairment does not substantially limit a major life activity, he does not have a disability as defined under the first prong of the Rehabilitation Act's "disability" definition.[6]

---

[6] While each case of disability is to be determined on its own merits, the determination that plaintiff's chronic active Hepatitis secondary to Hepatitis C is not a disabling condition comports with that of several courts that have analyzed whether or not Hepatitis C constitutes a disability under the Rehabilitation Act or the ADA. See Baker v. CSX Transp., Inc., 546 F. Supp. 2d 90, 99-100 (W.D.N.Y. 2008); Barber v. Verizon New England Inc., No. Civ. A. 05-

Although plaintiff failed to make a sufficient showing that he has an actual disability within the meaning of the Rehabilitation Act, he can still qualify for protection by showing that he has "a record of" or is "regarded as having" a disability within the meaning of the statute. See 29 U.S.C. § 705(20)(B). Yet, even for these two additional avenues for proving disability, the evidence put forth by plaintiff is insufficient to create a disputed issue of fact.

For a person to have "a record of" a disability under the Rehabilitation Act, he must have "a history of, or ha[ve] been misclassified as having, a mental or physical impairment that substantially limits one or more major life activities." 29 C.F.R. § 1630.2(k). Thus, a plaintiff's record of disability must still satisfy all three elements for proving actual disability in order to qualify him for protection. See Colwell v. Suffolk County Police Dept., 158 F.3d 635, 645-46 (2d Cir. 1998) (holding that plaintiffs' claims based on record of disability failed as a matter of law because the records of their impairments did not show substantial limitation of major life activities). As discussed above, it is clear that none of the medical evidence in the record establishes that plaintiff had a "record of disability" under the Rehabilitation Act. See Brower v. Cont'l Airlines, Inc., 62 F. Supp. 2d 896, 905 (E.D.N.Y. 1999) (holding that plaintiff's medical

390-ML, 2006 WL 3524465, at *4-6 (D. R.I. Dec. 6, 2006) (Hepatitis C that allegedly impaired "physical activity", sexual activity and the ability to reproduce not a disability); Grant v. Baptist Hosp. E., No. 304-CV-402H, 2005 WL 1503570, at *1 (W.D. Ky. June 23, 2005)("No reasonable jury could find that hepatitis C substantially limited Plaintiff's performance of major life activities."); Sussle v. Sirina Prot. Sys. Corp., 269 F. Supp. 2d 285, 301-02 (S.D.N.Y. 2003)("Since the Plaintiff does not proffer any specific facts, even via non-medical evidence to corroborate that Hepatitis C substantially limited his ability to reproduce and to engage in sexual relations, he has failed to demonstrate that he is disabled within the meaning of the ADA."); Rodgers v. Norfolk S. Corp., 304 F. Supp. 2d 961, 968 (S.D. Ohio 2003) ("[T]he Court cannot conclude that Plaintiff's Hepatitis C substantially limits her in the major life activity of working.")

20

documentation which did not show actual disability failed for the same reasons to establish a record of disability).

To prove disability under the "regarded as" disabled prong of the Rehabilitation Act, plaintiff must show "that [his] employer erroneously believed that [he] was substantially limited" in his ability to work or sleep or perform another major life activity.  Emanuel v. N.Y., No. 08-CV-1250, 2009 WL 4277075, at *7 (S.D.N.Y. Nov. 25, 2009).  On this record, no reasonable juror could find that plaintiff's employer regarded him as disabled at the time he was terminated. Although plaintiff's employer granted him a reasonable accommodation of a shift in his work start time, that accommodation was rescinded at the end of November 2001 when plaintiff failed to provide additional medical documentation that his impairment still existed.  At that time, plaintiff's employer indicated that it had fully complied with Dr. Esposito's request, as Dr. Esposito had written that plaintiff would be ready to return to full duty in June 2001.  The rescission of plaintiff's accommodation indicates that BCC did not perceive plaintiff to be substantially limited in his major life activities of working or sleeping.  Even though defendants were aware of plaintiff's chronic active Hepatitis condition, because of the medical documentation plaintiff had submitted, a reasonable factfinder could not conclude from this that defendants regarded plaintiff as substantially limited in his abilities to work and sleep after November 2001.  Drawing all reasonable inferences in favor of plaintiff, this court does not find that plaintiff was either actually limited in his abilities to work or sleep, or that he was regarded as or had a record of being substantially limited.

2.    Defendant has stated a legitimate, non-discriminatory explanation for plaintiff's termination, which plaintiff has failed to rebut

Even if the plaintiff could state a prima facie case of discrimination, I find that the defendants have stated a legitimate, non-discriminatory reason for terminating plaintiff's employment. The defendants have presented uncontroverted evidence that plaintiff violated the terms of his probationary employment when he had three unscheduled absences and three late arrivals in his first three months back at work following his six-month suspension for serious attendance problems. Furthermore, defendants presented evidence that plaintiff had severe time and attendance problems dating back to 1998, the year after he was hired, which resulted in his probationary employment status. Plaintiff had at least 77 unscheduled absences and 38 late arrivals during his employment at BCC. Plaintiff even admitted during his deposition that there were times when he had unscheduled absences from work. (Davis Dep. at 214.) Accordingly, defendants have stated a legitimate, non-discriminatory reason for terminating plaintiff's employment in 2002.

Plaintiff failed to present evidence showing that BCC terminated him for any reason other than his time and attendance violations. During his deposition, plaintiff never testified that when he failed to report to work he told his employer that he could not work because of his chronic Hepatitis. Plaintiff has not controverted the defendants' explanation that he was terminated for violating the terms of his probationary employment. Plaintiff admitted that he agreed to the probationary term of employment to settle his notices of discipline. In addition, plaintiff's testimony that he is an alcoholic and drank at least one pint of rum per day, undercuts his argument that his attendance problems were due to his alleged disability of chronic active Hepatitis. Because plaintiff has failed to rebut the defendants' legitimate, non-discriminatory

22

reason for terminating plaintiff's employment, I find that plaintiff has failed to state a claim for disability discrimination.

E.     Retaliation Claims

Plaintiff's complaint alleges that defendants retaliated against him in violation of the Rehabilitation Act. Specially, plaintiff alleges that his "unlawful termination was . . . in retaliation for [p]laintiff's complaints of disparate treatment" and that "defendants intentionally retaliated against [p]laintiff on the basis of a disability." (Compl. ¶¶ 37, 44.) To establish retaliation under the Rehabilitation Act, plaintiff must demonstrate that (1) he was engaged in protected activity; (2) the alleged retaliator knew that he was involved in protected activity; (3) an adverse decision or course of action was taken against him; and (4) a causal connection exists between the protected activity and the adverse action. Weixel v. Bd. of Educ. of City of N.Y., 287 F.3d 138, 148 (2d Cir. 2002).

Assuming, without deciding, that plaintiff has satisfied the first three elements, the court concludes that he has not satisfied the causality element. To establish a causal connection between the adverse employment action (his termination) and the protected activity (seeking reasonable accommodation)[7], plaintiff "must show that the allegedly adverse actions occurred in

---

[7] Seeking a reasonable accommodation for an alleged disability constitutes protected activity under Section 504 of the Rehabilitation Act. See Muller v. Costello, 187 F.3d 298, 311 (2d Cir. 1999). Plaintiff made the conclusory allegation in his complaint that he was terminated in retaliation for complaints of disparate treatment but the record contains no evidence of any complaint made by plaintiff. Plaintiff first testified that he filed a grievance with his union about discrimination but later testified that he was "not sure" if he filed the grievance and that "I was doing so many things at that time I don't know what I wrote and who I wrote to." Davis Dep. at 181-82.

circumstances from which a reasonable jury could infer retaliatory intent." Treglia v. Town of Manlius, 313 F.3d 713, 720 (2d Cir. 2002).

Plaintiff has not presented facts which would permit a reasonable jury to infer that the decision to fire him was motivated by his request for accommodations. Acting Executive Director Aman and Director of Nursing Murillo submitted signed declarations stating that plaintiff was terminated for his excessive absences and lateness and for violating the terms of his probationary employment. BCC's Employee Handbook outlines its attendance policy and sets forth that frequent unscheduled absences can lead to disciplinary action. There is simply no evidence that plaintiff was terminated for any reason other than absences and lateness from work. In addition, plaintiff admitted during his deposition that when he returned to work as a probationary employee in 2002 after his six month suspension, he requested to stay in his assigned shift and defendants submitted a copy of plaintiff's signed letter requesting to remain in the shift. Thus, the facts in the record demonstrate that the only time plaintiff requested a reasonable accommodation for his chronic Hepatitis was in March 2001, and he was granted the accommodation while his need persisted from June to November 2001. While the Second Circuit "ha[s] held that a close temporal relationship between a plaintiff's participation in protected activity and an employer's adverse actions can be sufficient to establish causation", see Treglia, 313 F.3d at 721, BCC's rescission of the accommodation at the end of November 2001 and plaintiff's termination occurred about a year apart – a period which is too distant to permit a jury to find a causal connection between the two events based on time proximity. Cf. Treglia, 313 F.3d at 721 (events occurred a month apart which is sufficient to establish causation); Reed v. A.W. Lawrence & Co., 95 F.3d 1170, 1178 (2d Cir. 1996) (events occurred twelve days apart

24

which is sufficient to establish causation); <u>Cobian v. N.Y. City</u>, No. 99 Civ. 10533, 2000 WL 1782744, at *18 (S.D.N.Y. Dec. 6, 2000)(four months between protected activity and adverse action is insufficient evidence of a causal connection). "[T]he longer the interval between the protected activity and the adverse employment action, the more attenuated becomes the evidence of the requisite causation." <u>Spadola v. N.Y. City Transit Auth.</u>, 242 F. Supp. 2d 284, 294 (S.D.N.Y. 2003). Having failed to make out a <u>prima facie</u> case, the court grants summary judgment in favor of defendants on plaintiff's retaliation claim.

F.      Section 1983 Claims Against Murillo And Aman

To prevail on a claim under 42 U.S.C. § 1983, plaintiff must show: (1) the deprivation of any rights, privileges, or immunities secured by the Constitution and laws; (2) by a person acting under the color of state law. 42 U.S.C. § 1983. "Section 1983 itself creates no substantive rights; it provides only a procedure for redress for the deprivation of rights established elsewhere." <u>Sykes v. James</u>, 13 F.3d 515, 519 (2d Cir. 1993). Plaintiff alleges that defendants' actions violate plaintiff's "constitutional right of equal protection and due process" and have "deprived plaintiff of his civil, constitutional and statutory rights[.]" (Compl. ¶ 48.)

1.      Equal Protection Discriminatory Termination Claim

Employment discrimination claims brought under section 1983 are analyzed under the same burden shifting framework employed in Title VII cases and Rehabilitation Act cases. <u>See</u> <u>Annis v. County of Westchester</u>, 136 F.3d 239, 245 (2d Cir. 1998)("In analyzing whether conduct was unlawfully discriminatory for purposes of § 1983, we borrow the burden-shifting framework of Title VII claims."). Under the test of <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973), the plaintiff has the initial burden of establishing a <u>prima facie</u> case of

discrimination. The burden then shifts to the defendant to articulate a "legitimate, nondiscriminatory reason" for his actions. Id. at 802. If the defendant meets this burden of production, then the plaintiff has the ultimate burden to show that the proferred nondiscriminatory reasons were a pretext for discrimination. Id.

"The Equal Protection Clause requires that the government treat all similarly situated people alike." Harlan Assoc. v. Vill. of Mineola, 273 F.3d 494, 499 (2d Cir. 2001)(citations omitted). To establish an equal protection violation, a plaintiff must "show[] that the defendant consciously applied a different standard . . . to similarly-situated individuals." Skehan v. Vill. of Mamaroneck, 465 F.3d 96, 111 (2d Cir. 2006)(citing LaTrieste Rest. & Cabaret, Inc. v. Vill. of Port Chester, 188 F.3d 65, 70 (2d Cir.1999)).

There is a two-step analytical process in assessing equal protection claims. See Phillips v. Girdich, 408 F.3d 124, 129 (2d Cir. 2005). First, a plaintiff must "demonstrate that he was treated differently than others similarly situated as a result of intentional or purposeful discrimination." Phillips, 408 F.3d at 129; Harlan Assoc., 273 F.3d at 499. This requires proof "that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." Personnel Adm'r v. Feeney, 442 U.S. 256, 279 (1979). Second, a plaintiff must show that "the disparity in treatment cannot survive the appropriate level of scrutiny." Phillips, 408 F.3d at 129. The Equal Protection Clause permits distinctions which are based on a person's disability, if they are rational and serve a legitimate end. See Garcia v. State Univ. Of N.Y. Health Scis. Ctr., 280 F.3d 98, 109 (2d Cir. 2001) ("Where disability discrimination is at issue, the Fourteenth Amendment

only proscribes government conduct for which there is no rational relationship between the disparity of treatment and some legitimate governmental purpose.").

"To be similarly situated, the individuals with whom [the plaintiff] attempts to compare [himself] must be similarly situated in all material respects." Shumway v. United Parcel Serv., Inc., 118 F.3d 60, 64 (2d Cir. 1997)(internal quotation marks omitted). The Second Circuit has clarified that the plaintiff must establish "a reasonably close resemblance of the facts and circumstances of plaintiff's and comparator's cases, rather than a showing that both cases are identical." Graham v. Long Island R.R., 230 F.3d 34, 40 (2d Cir. 2000). "[A] court can properly grant summary judgment where it is clear that no reasonable jury could find the similarly situated prong met." Harlen Assoc., 273 F.3d at 499 n.2.

Plaintiff's complaint can be read as stating a selective enforcement claim alleging that he was part of an identifiable class or group of disabled or allegedly disabled employees who were invidiously discriminated against on the job, culminating in termination.[8]  Based on the record

---

[8] If plaintiff intended by his complaint to bring a claim that he was treated differently than similarly situated employees solely because of personal malice on the part of the defendants or that defendants unfairly singled him out because of his chronic active Hepatitis, plaintiff's claim would also fail. The Supreme Court recently held that class of one claims are invalid in the public employment context. See Engquist v. Or. Dep't of Agric., 128 S. Ct. 2146 (2008). The Court observed that in the employment context, "the rule that people should be 'treated alike, under like circumstances and conditions' is not violated when one person is treated differently from others, because treating like individuals differently is an accepted consequence of the discretion granted [the employer]." Id. at 2154. The Court stated: "We have never found the Equal Protection Clause implicated in the specific circumstances where, as here, government employers are alleged to have made an individualized, subjective personnel decision in a seemingly arbitrary or irrational manner." Id. at 2155. Thus a state employee, like the plaintiff, who believes he may have been mistreated due to personal malice on the part of his supervisors or because of his specific chronic Hepatitis diagnosis may no longer proceed on a class of one theory. See id. at 2149; see also Appel v. Spiridon, 531 F.3d 138, 141 (2d Cir. 2008); Wiggins v. N.Y. City Dep't of Corr., 06 Civ. 1946, 2008 WL 3447573, at *7 (S.D.N.Y. Aug. 12, 2008).

before the court, plaintiff failed to establish the elements required to make out a _prima facie_ case.

Plaintiff has not presented the court with any facts demonstrating that similarly situated mental

health therapy aids without disabilities were not terminated. See Shumway, 118 F.3d at 64.

Significantly, plaintiff failed to identify a single similarly situated individual who had an

extensive record of absences and reporting late to work but was not terminated. The only

individual whom plaintiff claims was treated differently than him was a mental health therapy aid

who plaintiff believes was given light duty, but plaintiff admits he has no knowledge of the

circumstances and "found this out through the grapevine." See Davis Dep. at 282-83. Plaintiff

failed to oppose the motion for summary judgment and therefore provided no competent

evidence of comparators. For this reason alone defendants Murillo and Aman should be granted

summary judgment. See Pape v. Bd. of Ed. of Wappingers Cent. Sch. Dist., No. 07-CV-8828,

2009 WL 3151200, at *7 (S.D.N.Y. Sept. 29, 2009)(dismissing equal protection claim because

disabled student failed to identify any "similarly situated" person who was treated differently);

Rafano v. Patchogue-Medford Sch. Dist., No. 06-CV-5367, 2009 WL 789440, at *6 (S.D.N.Y.

Mar. 20, 2009)(granting motion for summary judgment after finding that student suffering from

ADHD and bipolar disorder failed to identify a single similarly situated individual); Guerrero v.

Conn. Dep't of Children & Families, 315 F. Supp. 2d 202, 210 (D. Conn. 2004)(granting motion

for summary judgment after finding that plaintiff was not similarly situated to the comparator

where "the comparator did not have the history of past disciplinary problems that [plaintiff]

had"); Padilla v. Harris, 285 F. Supp. 2d 263, 270 (D. Conn. 2003)(granting motion for summary

judgment noting "[p]rior disciplinary problems may be sufficient to justify deferential treatment

of otherwise similarly situated employees."). There is simply no evidence on which a reasonable

fact finder could conclude that plaintiff and members of his class received differential treatment from similarly situated BCC employees. Thus defendants are entitled to summary judgment on plaintiff's Equal Protection Clause claim.

    2.    <u>Due Process Claim</u>

Plaintiff's complaint can be read as alleging that defendants violated his Fourteenth Amendment procedural due process rights. The threshold questions in any § 1983 claim for denial of procedural due process are (1) whether the plaintiff possessed a liberty or property interest protected by the United States Constitution or federal statutes and, if so, (2) what process was due before the plaintiff could be deprived of that interest. <u>Green v. Bauvi</u>, 46 F.3d 189, 194 (2d Cir. 2002).

Because plaintiff was terminated by BCC, the first question at issue is whether plaintiff possessed a property interest in his employment and whether the Fourteenth Amendment protects that interest. Property interests are not created by the Constitution; rather, "they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law-rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." <u>Bd. of Regents of State Colls. v. Roth</u>, 408 U.S. 564, 577 (1972). In order to have had a property interest in his employment, plaintiff must have had "a legitimate claim of entitlement to it." <u>Id.</u> "In the employment context, a property interest arises only where the state is barred, whether by statute or contract, from terminating (or not renewing) the employment relationship without cause." <u>S & D Maint. Co. v. Goldin</u>, 844 F.2d 962, 967 (2d Cir. 1988).

At the time plaintiff was terminated, he was on probation. Under New York law, "'[i]t is well settled that a probationary employee, unlike a permanent employee, has no property rights in his position and may be lawfully discharged without a hearing and without any stated specified reason.'" Finley v. Giacobbe, 79 F.3d 1285, 1297 (2d Cir. 1996)(quoting Meyers v. City of N.Y., 208 A.D.2d 258, 262 (2nd Dep't 1995); see also York v. McGuire, 63 N.Y.2d 760, 761 (1984) (probationary employee may be terminated without a hearing or statement of reasons); Flood v. County of Suffolk, 820 F. Supp. 709, 713 (E.D.N.Y. 1993) (probationary employee had no property right in her position). As a probationary employee, plaintiff had no reasonable expectation in continued employment and therefore has no actionable property right on which to base his § 1983 due process claim. Defendants are granted summary judgment on this claim.

F.    Plaintiff's State Law Claims Against Murillo And Aman

Where a district court has dismissed all claims over which it has original jurisdiction, the court may decline to exercise jurisdiction over state law claims. 28 U.S.C. § 1367(c)(3); see also United Mine Workers of Am. v. Gibbs, 383 U.S. 715, 726 (1966) (district court may, in its discretion, dismiss a plaintiff's state law claims where "considerations of judicial economy, convenience, and fairness to the parties" require). Because plaintiff's federal claims have been dismissed, I decline to exercise jurisdiction over his claims pursuant to the New York State Human Rights Law and the New York City Human Rights Law.

III.    Conclusion

For the foregoing reasons, defendants' motion for summary judgment is granted and plaintiff's complaint is dismissed.

SO ORDERED.

_S/ Hon. Allyne R. Ross_

Allyne R. Ross
United States District Judge

Dated: December 29, 2009
        Brooklyn, New York

SERVICE LIST:

> Pro Se Plaintiff
> Gerald Davis
> 215-01 104th Avenue
> Queens Village, NY 11429

> State of New York Office of the Attorney General
> Joanne Skolnick, Esq.
> Assistant Attorney General
> 120 Broadway
> New York, NY 110271

cc:             Magistrate Judge Lois Bloom